Troy P. Foster #017229
**The Foster Group, PLLC**
902 W. McDowell Road
Phoenix, Arizona 85007
Tel: 602-461-7990
tfoster@thefosterlaw.com

Daniel Kotchen (*pro hac vice motion forthcoming*)
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
(202) 471-1995
(202) 280-1128 (Fax)
dkotchen@kotchen.com
*Attorneys for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle Bernardo, an individual | Case No.: |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| TSMC Arizona Corporation, | |
| Defendant. | |

1.      Plaintiff Michelle Bernardo is a former employee of Defendant TSMC Arizona Corporation ("TSMC Arizona") and brings this action under federal and state discrimination laws to remedy retaliatory acts by her former employer, which culminated in Ms. Bernardo's termination by TSMC Arizona in March 2025.

2.      TSMC Arizona is a subsidiary of Taiwan Semiconductor Manufacturing Co. Ltd. ("TSMC Ltd." or, together with its subsidiaries, "TSMC"). TSMC Ltd. is headquartered in Taiwan, but maintains a number of subsidiaries in the United States, Canada, Japan, China, South Korea, and Europe.

3.      TSMC is the world's leading manufacturer of semiconductors, the chips that power everything from smartphones to cars to satellites to weapons systems, manufacturing over 90% of the world's leading-edge logic chips and supplying well-known customers such as Google, Nvidia, and Apple with the chips used in their technology. TSMC employs over 83,000 employees worldwide, including 4,497 workers in North America as of December 31, 2024.[1] Approximately 3,000 of TSMC's employees work for TSMC Arizona, and the vast majority of these employees are from Taiwan or China (many of whom require visas in order to work in the U.S.).

4.      TSMC Arizona's grossly disproportionate workforce is the result of an intentional pattern and practice of employment discrimination against individuals who are not of East Asian race, not of Taiwanese or Chinese national origin, and who are not citizens of Taiwan or China, including discrimination in hiring, staffing, promotion, and retention/termination decisions. In addition, TSMC Arizona routinely subjects non-East Asians (including those who are not of Taiwanese or Chinese descent) to a hostile work environment where verbal abuse, gaslighting, isolation, and humiliation is common, and oftentimes leads to the constructive discharge of these employees. This discriminatory scheme and mistreatment are the subject of a class action lawsuit pending in the Northern District of California in which Ms. Bernardo is a Named Plaintiff. *See Howington v. Taiwan Semiconductor Manufacturing Co. Ltd.*, No. 5:24-cv-5684 (N.D. Cal.).

5.      During Ms. Bernardo's tenure with TSMC Arizona, she repeatedly complained about the discriminatory practices described herein and sought to join the pending *Howington* class action lawsuit. After Ms. Bernardo engaged in this protected activity, TSMC Arizona retaliated against her, demoting Ms. Bernardo, stripping her of job duties, awarding her an unjustifiably low performance review score, denying her training, revoking her printing privileges, subjecting her to an increasingly hostile work environment,

---

[1] Form 20-F at 50 (Dec. 31, 2024), https://investor.tsmc.com/sites/ir/sec-filings/2024%2020-F.pdf.

ultimately terminating her employment, and generally subjecting her to a pattern of retaliation to which its preferred category of employee—East Asians—did not endure.

**PARTIES**

6.      Plaintiff Michelle Bernardo was born in the Philippines, is a United States citizen, and is of Filipino American national origin and ancestry. She currently resides in Arizona.

7.      Ms. Bernardo has exhausted her administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation by TSMC Arizona, and receiving a Notice of Right to Sue on March 11, 2025. Ms. Bernardo's Title VII retaliation claim is timely based on a tolling agreement entered into between Ms. Bernardo and TSMC prior to Ms. Bernardo filing her EEOC charge. Pursuant to that agreement, the statute of limitations for Plaintiff to file her Title VII retaliation claim was tolled pending a decision on the plaintiffs' motion to amend in *Howington*, No. 5:24-cv-5684 (N.D. Cal.). A decision on that motion was issued on June 13, 2025, and Plaintiff brings this complaint within 90 days of that order.

8.      TSMC Arizona is an Arizona corporation, with its principal place of business at 5088 W. Innovation Circle, Phoenix, AZ 85083. TSMC Arizona provides semiconductor manufacturing support to its ultimate parent, Taiwan Semiconductor Manufacturing Co., Ltd.

**JURISDICTION AND VENUE**

9.      This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-2, *et seq.*, the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, and the Arizona Civil Rights Act,. A.R.S. §§ 41-1401 to -1493.02 ("ACRA").

10.      Subject Matter Jurisdiction. The Court has pursuant to 28 U.S.C. § 1331, 42 U.S.C. §2000e-2, and 42 U.S.C. § 1981(a) (federal question jurisdiction), and supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C.§ 1367.

11.      Personal Jurisdiction. This Court has personal jurisdiction over TSMC Arizona because TSMC Arizona is an Arizona corporation, with its principal place of

business in the State. This Court also has personal jurisdiction over TSMC Arizona because the allegations set forth in this Complaint arise from TSMC Arizona's employment of Ms. Bernardo in Arizona, including her complaints to and about TSMC Arizona while working in Arizona, and TSMC Arizona's retaliation against Ms. Bernardo while she worked and lived in Arizona.

12.    Venue. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) because TSMC Arizona resides in this District, conducts business in this District, and committed acts giving rise to this action within this District, as described below (including in Phoenix).

## **BACKGROUND**

### ***TSMC's Discriminatory and Hostile Work Environment***

13.    TSMC is a manufacturer and supplier of semiconductors (or microchips), a key component of a vast array of electronic devices. Unlike other major microchip manufacturers, TSMC does not produce its own products—rather, it works with customers like Google and Apple to design and manufacture microchips for use in their products. This business has been enormously profitable for TSMC, generating a net revenue of over $94 billion in 2024. While TSMC Ltd. is a Taiwanese company and its operations are centered in Taiwan, the majority (70%) of TSMC's revenue comes from North America,[2] where TSMC Ltd.'s subsidiaries, TSMC Arizona Corporation, TSMC North America, TSMC Technology, Inc., and TSMC Washington, LLC, are located and operate. The bulk of TSMC's U.S. operations are in Phoenix, Arizona under the TSMC Arizona employment entity, which employs around 3,000 individuals in North America. TSMC Arizona began production on its first Arizona fab in April 2021 and volume production commenced at the end of 2024. The second facility is currently under construction, and TSMC Arizona began building a third fab in April 2025. In March 2025, TSMC further announced its intention to

---

[2] Form 20-F at 16 (Dec. 31, 2024), https://investor.tsmc.com/sites/ir/sec-filings/2024%2020-F.pdf.

build three additional semiconductor manufacturing facilities, two advanced packaging facilities and an R&D center in Arizona.

14. TSMC is rapidly expanding in the United States, thanks, in part, to receiving $6.6 billion in direct funding and $5 billion in proposed loans from the CHIPS Act, allowing it to construct its Phoenix fabs,[3] which TSMC anticipates will create about 6,000 manufacturing jobs and 20,000 construction jobs in the U.S.[4] As of December 31, 2024, TSMC employed 4,497 employees in North America, the vast majority of whom work in the U.S., with plans to drastically increase that number in the coming years as it completes construction on its Arizona fabs. In order to receive this funding from the federal government, TSMC submitted a diversity plan "'demonstrat[ing] appropriate investments and commitments to recruit, train, hire, retain, and upskill a skilled and diverse workforce'" in the U.S.

15. But TSMC's claimed commitment to diversity was merely a façade designed to coax considerable funding ($6.6 billion) from the federal government in order to grow TSMC's U.S. operations and to make positions available for its preferred groups—individuals of East Asian race and Taiwanese or Chinese national origin (including citizens of those countries). TSMC's discriminatory scheme is implemented top-down, originating with the parent corporation, TSMC Ltd., and permeating throughout its U.S. subsidiaries, including TSMC Arizona, who are expected to implement and further TSMC's discriminatory employment practices and hostile work environment without pushback.

16. On August 22, 2024, Deborah Howington, an employee of one of TSMC Ltd.'s subsidiaries, TSMC North America, filed a putative class action complaint against TSMC Ltd. and its U.S. subsidiaries, including TSMC Arizona, alleging pervasive, ongoing race and citizenship discrimination against non-Taiwanese/Chinese citizens and non-East

---

[3] Form 20-F at 6 (Dec. 31, 2024), https://investor.tsmc.com/sites/ir/sec-filings/2024%2020-F.pdf.

[4] TSMC Will Receive $6.6 Billion to Bolster U.S. Chip Manufacturing, NEW YORK TIMES (Apr. 8, 2024), https://shorturl.at/dDJsR.

Asian employees, former employees, and applicants. *See* Compl., Dkt. 1, *Howington v. Taiwan Semiconductor Manufacturing Co.*, No. 5:24-cv-5684 (N.D. Cal. Aug. 22, 2024). On November 8, 2024, an amended complaint was filed in the case, adding twelve additional Named Plaintiffs, joining their discrimination and hostile work environment claims, adding Title VII class claims, and adding individual retaliation complaints on behalf of certain new Named Plaintiffs. Am. Compl., Dkt. 20, *Howington*, No. 5:24-cv-5684 (N.D. Cal. Nov. 8, 2024). On February 27, 2025, the plaintiffs in the case moved to again amend the complaint to add fifteen additional Named Plaintiffs, including Ms. Bernardo, and to add individual retaliation claims on behalf of some of those proposed plaintiffs, including Ms. Bernardo. Mot. for Leave, Dkt. 37, *Howington*, No. 5:24-cv-5684 (N.D. Cal. Feb. 27, 2025). TSMC opposed that motion, and the court granted the motion in part, allowing the addition of the fifteen proposed new plaintiffs and their class claims, but denying the addition of individual, non-class claims asserted on behalf of the new plaintiffs. Order, Dkt. 68, *Howington*, No. 5:24-cv-5684 (N.D. Cal. June 13, 2025).

17.     TSMC's classwide discriminatory scheme is described in the operative complaint in that matter, which is attached as **Exhibit A** and incorporated herein by reference.

### TSMC Arizona's Discrimination Against Ms. Bernardo and Hostile Work Environment

18.     Michelle Bernardo is a Human Resources professional with nine years of relevant experience. She holds an Associate of Science degree in Paralegal, a Bachelor of Science degree in Business Administration (International Business), an MBA in Management, and is a Ph.D. candidate (I/O Psychology). Ms. Bernardo has experience across all HR functions on a global scale and has helped launch two start-up businesses in Arizona—Chewy (4,000 employees) and TSMC Arizona (3,000 employees).

19.     Ms. Bernardo joined TSMC Arizona in December 2021, after having been recruited by a former manager from Chewy, and helped support approximately 2,500 employees as a Senior Human Resources Business Partner ("HRBP").

20.     At TSMC Arizona, Ms. Bernardo reported to Sheng Cho Lai, a HRBP Manager who had no prior HR experience. Mr. Lai treated Ms. Bernardo poorly, bullied her, and would shame her on emails that included Ms. Bernardo's colleagues. Mr. Lai also spoke negatively about Ms. Bernardo's skill sets to Elaine Wei, a TSMC Arizona colleague. Mr. Lai himself was a poor performer, but was never disciplined, and was instead favored as he spoke Mandarin. Mr. Lai's constant harassment affected Ms. Bernardo and her schoolwork, forcing Ms. Bernardo to escalate her concerns of discrimination and hostile work environment to Kenny Huang, Senior HRBP Manager who oversaw the department, Ted Chiang, Senior HR Director (who had no prior HR experience), and at times, Richard Liu, an HR Director (all of whom are Taiwanese). While Ms. Bernardo asked Mr. Huang to meet with her in-person to discuss Mr. Lai's treatment, that meeting never took place, and Mr. Lai's hostile conduct continued unabated for months. As a result, Ms. Bernardo's mental and emotional health began to decline as she was constantly bullied, harassed, and ridiculed for any and all mistakes, despite not having received training nor been presented with any standard operating procedures for recruiting. After again escalating her concerns to Mr. Huang, Mr. Chiang, and Mr. Liu, Ms. Bernardo was finally able to change managers. She began reporting to Mr. Huang in early 2024 and thereafter reported to Rene Perez-Cabrera.

21.     Mr. Lai treated two of Ms. Bernardo's non-Taiwanese colleagues, Ashlee Ramage and Elene Huizar, in a similarly hostile manner, placing both of them on Corrective Action Plans for purported performance issues without warning and without any type of progressive discipline. These employees were then transferred to Nai-Yu Hsu's section, another HR manager who had no prior Human Resources experience. Ms. Hsu would constantly berate Ms. Bernardo's non-Taiwanese colleagues in public and also made inappropriate comments to her direct reports on Teams and in-person. However, Ms. Hsu was not disciplined for her conduct, and instead received only light coaching, and was promoted to a higher job grade shortly thereafter.

22.    When Ms. Bernardo began reporting to Mr. Huang in early 2024, he would sometimes speak to Ms. Bernardo (though only in Mandarin with Katherine Yeh, who is Taiwanese, translating). But Mr. Huang's friendliness quickly wore off, and he began to ignore Ms. Bernardo, refusing to greet her and directing her to Ms. Yeh when she asked for assistance. Mr. Huang would provide direction to Ms. Yeh, in Mandarin, and Ms. Yeh was tasked with then providing that direction to Ms. Bernardo. Mr. Huang never had any one-on-one meetings with Ms. Bernardo to discuss her performance, and would not provide her with any coaching or training, but was quick to email her when he noticed that she had made even the smallest of mistakes.

23.    Ms. Yeh too treated Ms. Bernardo poorly and would publicly shame her on emails and broadcast her mistakes to her team members. This, in turn, caused Ms. Bernardo to become isolated from her team, and many team members stopped talking to Ms. Bernardo altogether, refused to help her, and also publicly shamed her when she asked for help or had questions.

24.    Ms. Yeh is married to Eugene Tsai, an HR employee who had no prior HR experience before being hired by TSMC. Ms. Yeh convinced Mr. Chiang to hire her husband into the same HR department where she worked, thereby foreclosing a local, experienced hire from assuming that role.

25.    It is apparent from Ms. Bernardo's experience at TSMC Arizona that the company is averse to hiring qualified non-Taiwanese and non-Chinese workers, preferring instead to staff Taiwanese workers with no prior relevant experience in HR roles. For instance, during Ms. Bernardo's tenure with TSMC Arizona, members of TSMC Arizona's engineering department have been transferred to HR roles, and a manager from process integration, Nai-Yu Hsu, was given a managerial role in HR despite still being under process integration's headcount (TSMC simply wanted a Taiwanese worker staffed in this role). In addition, when Ms. Bernardo was reporting to Mr. Huang, two of the departments she supported were taken from her and given to Esther Lu, a Taiwanese worker with no U.S. experience and no knowledge of U.S. labor laws. Ms. Lu was also more recently given

another department Ms. Bernardo supported, Industrial Safety and Environmental Protection ("ISEP"). Similarly, Helen Chung, a secretary for TSMC Arizona, had her role changed to HR by Mr. Chiang, despite her not having any prior HR experience, in order to increase her chances of localization (i.e. being considered a local employee rather than an assignee by TSMC Arizona, thereby making her eligible for the green card process). Ms. Chung was ultimately given a recruiting role in HR, despite her lack of experience. When Ms. Bernardo sent Ms. Hsu the resume of a former non-Taiwanese coworker with HR experience, Ms. Hsu told Ms. Bernardo that the candidate would not be hired, claiming, falsely, that she did not have relevant experience.

26.    Ms. Bernardo was also targeted by TSMC Arizona for not being a member of the company's favored group. On one occasion, the Director of Manufacturing and AMHS, Wexler Lee, asked Scott Holman, TSMC Arizona's former CHRO, to have a Taiwanese worker who speaks Mandarin support her organization, rather than Ms. Bernardo. Mr. Holman (who is not Taiwanese or Chinese) denied Mr. Lee's request, but thereafter, Mr. Holman left TSMC Arizona and Ms. Bernardo was stripped of the departments she supported, which were given to Ms. Lu and Mr. Perez-Cabrera.

27.    Older American workers and women[5] are particularly disfavored by TSMC, including TSMC Arizona, and H.T. Yang, Fab Director, specifically instructed recruiters not to hire employees who are 40 or older. Recruiters are instead expected to seek out "young talents," which is how managers at TSMC often refer to younger employees. After Ms. Bernardo was forced out of the company, her responsibilities were given to a summer intern from 2024 who was hired as a Human Resources Business Partner. In addition, some TSMC managers ask job candidates if they plan to become pregnant, which TSMC seeks to avoid, preferring to hire employees without families upon whom it can imposed punitive work requirements. TSMC also tracks the citizenship of its applicants and favors Taiwanese

---

[5] On one occasion, Lars Lee, a section manager at TSCM, told employees to turn off their phones and laptops during a meeting then displayed pictures of women in bikinis.

and Chinese candidates over employees of other nationalities. During a meeting in which localization was discussed, a Taiwanese manager commented that the Taiwanese are afraid of hiring more local workers as it will "change the environment" at TSMC.

28.     It is clear that TSMC protects its Taiwanese workers at all costs, allowing them to make mistakes without reprimand, while scrutinizing the work of non-Taiwanese workers and using small mistakes as pretext to force U.S. workers out of the company for purported performance issues. In fact, H.T. Yang changed the progressive discipline process so that TSMC could fire local hires more quickly. When TSMC wants to get rid of a non-Taiwanese, non-Chinese, local hire, it will target that employee and blame all mistakes on him or her so as to "justify" an S- or I performance appraisal rating (the two lowest performance review scores), thereby forcing the employee out of the company. Ms. Bernardo has been a victim of this practice, pursuant to which TSMC Arizona has overloaded her with work and been overly critical of her performance, despite not having set any performance goals for Ms. Bernardo since 2023, nor scheduling any one-on-one meetings with her to discuss TSMC Arizona's expectations. Ms. Bernardo has been screamed at for small errors, and even blamed for errors made by Headquarters in Taiwan, which are out of her control. Ms. Bernardo was worried throughout her tenure with TSMC Arizona that the company would use purported "performance" issues to manage her out of the company. Conversely, Taiwanese workers who make mistakes are simply counseled— or in the case of Nai-Yu Hsu, are promoted and given a new job within the HR department.

29.     Taiwanese hires are also treated more favorably than local hires, and are given extremely generous localization packages, which include housing, cars, paid tax preparations, etc. if they localize within one year. U.S. hires, on the other hand, receive just a one-time $5,200 bonus for joining TSMC Arizona and relocating to Arizona for work. Taiwanese workers are also given more generous vacation packages. When Ms. Bernardo sought to take a 3 to 4 week vacation in July 2024 to complete her schooling, Mr. Huang and Mr. Chiang denied Ms. Bernardo's PTO request, while allowing Taiwanese workers to take equivalent time off.

30.     At TSMC, Mandarin is constantly spoken when discussing business, to the exclusion of most U.S. workers who are unfamiliar with the language, and it is common for management at TSMC to yell and belittle employees, including in front of others so as to humiliate the worker.

31.     In November 2024, after escalating her concerns of discrimination and hostile work environment to Kenny Huang, Ms. Bernardo had a meeting with Brian Mullin and Mr. Perez-Cabrera (the new BPHR to whom Ms. Bernardo now reports) to discuss her performance. During that meeting, in retaliation, Ms. Bernardo was told that Mr. Chiang and Mr. Huang wanted to place her on a Corrective Action Plan, despite them never having had a one-on-one conversation with Ms. Bernardo regarding her performance, and informed Ms. Bernardo that if her performance did not improve, she would be terminated.

32.     On November 8, 2024, Ms. Bernardo had a second meeting with Mr. Perez-Cabrera and Mr. Mullin (who has since resigned from TSMC Arizona in December 2024), in which TSMC's retaliation of Ms. Bernardo continued. During that meeting, Ms. Bernardo's performance was critiqued, and while Mr. Perez-Cabrera cited an Excel document of Ms. Bernardo's purported mistakes that was compiled by Ms. Yeh, Ms. Bernardo was not permitted to review the documentation. Ms. Bernardo was informed that she would either be put on a Corrective Action Plan, or that she could accept severance money and leave the company (Mr. Perez-Cabrera urged Ms. Bernardo to resign multiple times during the meeting). Ms. Bernardo, however, wished to remain with TSMC Arizona and informed Mr. Perez-Cabrera of the same.

33.     On November 15, 2024, Ms. Bernardo and Mr. Perez-Cabrera had a meeting with a TSMC Arizona employee to discuss the employee's time off request. However, once the employee left the meeting, Mr. Perez-Cabrera began discussing Ms. Bernardo's path forward at TSMC Arizona and continued TSMC's retaliatory treatment of Ms. Bernardo. For example, Mr. Perez-Cabrera belittled Ms. Bernardo, telling her that moving forward, "Just don't fuck up! Get your shit done! Get it done!" Mr. Perez-Cabrera claimed that Ms. Bernardo did not have the skills to work for TSMC and that she did not know how to talk to

Taiwanese people. He informed Ms. Bernardo that TSMC Arizona was moving her away from her people-facing role (which is her strength). He also stated that she would receive an S- ("poor") performance rating (despite the fact that Ms. Bernardo had not yet had a formal performance review meeting). At the end of the meeting, Mr. Perez-Cabrera commented: "I don't know how the Fuck you got hired in the first place," and then left for another meeting. Ms. Bernardo was shocked by his abrasive conduct (although she has heard Mr. Perez-Cabrera curse regularly in the workplace). The conversation was extremely unprofessional, and left Ms. Bernardo feeling disappointed, upset, and belittled.

### Ms. Bernardo Raises Concerns and TSMC Arizona Escalates Its Retaliation

34.    Ms. Bernardo reported the incident in which she was yelled at and threatened by Mr. Perez-Cabrera to the President of HR, Rose Castanares, on December 5, 2024, stating that she felt like she was being subjected to a hostile work environment, that members of HR's leadership team should encourage, rather than berate employees, and that swearing at and insulting employees is inappropriate. Ms. Bernardo cc'd Ted Chiang, Samantha Jarvinen, Employee Relations (who investigates serious claims), and Richard Liu on her email. Ms. Castanares responded to Ms. Bernardo, stating that what she described "is not acceptable" and asked Samantha Jarvinen to investigate.

35.    Shortly after Ms. Bernardo reported Mr. Perez-Cabrera's conduct, Mr. Chiang approached Ms. Bernardo at her cubicle, and chastised her for not raising the concern to him first, as her complaint reflected on both him and Ms. Bernardo and how they work as a team. But Ms. Bernardo had previously approached Mr. Chiang to report Mr. Lai's harassment, and Mr. Chiang had taken no action.

36.    While Ms. Jarvinen interviewed both Ms. Bernardo and Mr. Perez-Cabrera regarding the incident, because they were the only two individuals in the room, Ms. Jarvinen concluded that it was a "he said/she said" incident that could not be substantiated. Ms. Bernardo was extremely upset that her complaints were not taken seriously by TSMC.

37.    Thereafter, Ms. Bernardo was informed that she would be demoted to an entry level HR role (and tasked with only administrative work) and was formally awarded

an S- ("poor") appraisal score—acts of retaliation for having recently raised discrimination concerns.

### TSMC Arizona Learns of Ms. Bernardo's Intent to Participate in the Howington Class Action and Further Retaliates

38.     On February 5, 2025, TSMC learned that Ms. Bernardo would be seeking to participate in the class action lawsuit as a Named Plaintiff, having received a draft of the proposed Second Amended Complaint from the plaintiffs containing Ms. Bernardo's allegations.

39.     In the draft complaint, Ms. Bernardo included most of the above allegations, as well as allegations concerning specific episodes of alleged misconduct by certain employees of Taiwanese or Chinese national origin and TSMC's failure to investigate or otherwise address the misconduct, which stood in stark contrast to its retaliation against Ms. Bernardo for reporting TSMC's discriminatory actions.

40.     Upon reviewing the draft complaint, TSMC informed Plaintiffs' counsel that it found a number of the complaint's allegations—including the aforementioned allegations by Ms. Bernardo—"inappropriate for inclusion in a pleading." TSMC initially claimed to be concerned that Ms. Bernardo's allegations violated TSMC's "HR practices and policies" under which "investigations of alleged incidents of employee misconduct" are "kept confidential" and that the allegations also violated "the Company's Proprietary Information and Inventions Agreement," which defines "proprietary information" to include the "salaries, duties, qualifications, performance levels, and terms of compensation of other employees."

41.     In response, and to further retaliate against Ms. Bernardo, TSMC refused to sign Ms. Bernardo substantive work, denied Ms. Bernardo training she requested, stripped Ms. Bernardo of her role overseeing the Employee Stock Purchase Plan in Taiwan, and revoked Ms. Bernardo's printing privileges.

42.     On February 21, 2025, Ms. Bernardo was called into a meeting with Gabriel Tischer, a Proprietary Information Protection Division ("PIPD") investigator. Mr. Tischer

explained to Ms. Bernardo that she was under investigation because TSMC Arizona had noticed a "spike in [her] printing activity" in December 2024. TSMC Arizona had never before investigated Ms. Bernardo for document printing, and her printing habits had remained the same throughout her tenure with TSMC Arizona and did not arouse any PIPD suspicion in December. Ms. Bernardo was concerned that TSMC Arizona's investigation was pretextual and was designed to further retaliate against Ms. Bernardo for her seeking to join the class action case. Ms. Bernardo asked to have her counsel present for an interview, and an interview with counsel present was then arranged for March 11, 2025.

43.    In advance of the March 11 interview, TSMC Arizona clarified the precise scope of its investigation and concerns about Ms. Bernardo. Specifically, TSMC Arizona stated that it was "investigating whether Ms. Bernardo improperly disclosed confidential personnel information about other employees that she received in her role as a senior employee in TSMC's HR Department," making clear that Ms. Bernardo's allegations within the proposed Second Amended Complaint concerning other employees underlaid TSMC Arizona's investigation.

44.    Because Ms. Bernardo's counsel drafted the proposed Second Amended Complaint based on privileged communications with Ms. Bernardo, in advance of the interview, Ms. Bernardo's counsel sought assurances from TSMC Arizona that it would not ask Ms. Bernardo about her communications with counsel and that the questioning would focus only on Ms. Bernardo's conversations with non-attorneys (such as other TSMC Arizona employees or non-employees). TSMC Arizona assured Ms. Bernardo's counsel that it would not ask Ms. Bernardo about her communications with counsel, stating "[w]e will not ask her about attorney-client communications."

45.    On March 3, 2025, counsel for TSMC Arizona and Ms. Bernardo agreed that her interview would occur in-person at TSMC Arizona's offices in North Phoenix the following week, on March 11. On the morning of March 5, Ms. Bernardo arrived early to work, around 7:00 a.m., and was promptly escorted out of the North Phoenix "Gown A

Building" where she worked. TSMC Arizona confiscated her cell phone and laptop, and put Ms. Bernardo on paid administrative leave.

46.     At this point, it was clear that TSMC Arizona intended to terminate Ms. Bernardo because of certain allegations she had made in the proposed Second Amended Complaint. Ms. Bernardo's counsel promptly raised retaliation concerns with TSMC, and noted that the forthcoming interview was simply a pretext to terminate Ms. Bernardo. TSMC responded that Ms. Bernardo's advancing discrimination claims against TSMC "does not insulate her from having to abide by TSMC's workplace rule and policies."

47.     During Ms. Bernardo's interview with TSMC Arizona on March 11, TSMC accused Ms. Bernardo, without any basis, of "obviously" hiding something from TSMC. And despite having assured Ms. Bernardo and her counsel that TSMC would not be asking Ms. Bernardo about privileged communications with counsel, TSMC Arizona's questioning focused largely on Ms. Bernardo's communications with her counsel, Kotchen & Low LLP, and focused on whether Ms. Bernardo's allegations in the proposed Second Amended Complaint about other employees had come from her so that TSMC could "make an employment decision" on that basis. TSMC stated, in no uncertain terms, that it was concerned that Ms. Bernardo had disclosed information about other employees to her attorneys, and that it did not believe that such a disclosure was protected.

48.     Because TSMC Arizona had assured Ms. Bernardo that she would not be asked about communications with her counsel, Ms. Bernardo refused to discuss such privileged communications at the interview, but confirmed that she had not disclosed information about TSMC Arizona employees contained in the Second Amended Complaint to anyone other than counsel. Undeterred, TSMC repeatedly asked Ms. Bernardo about her communications with counsel and went so far as to accuse Ms. Bernardo of being "untruthful" for refusing to disclose those privileged communications.

49.     During the interview, TSMC Arizona also asked Ms. Bernardo about a spike in Ms. Bernardo's printing activity in December 2024. As Ms. Bernardo explained, that spike was because Ms. Bernardo inadvertently hit "print all" for six copies of a long

document (to be handed out at a meeting), when she intended to print only a portion of the document. She shredded the excess portions of the document, using a shredder monitored by employee cameras. TSMC Arizona also asked Ms. Bernardo about four emails and a document she had taken off-premises in December 2024, and Ms. Bernardo explained that the documents were emails with her managers and her organizational chart that all concerned her employment with TSMC Arizona, and that she had taken these documents home using TSMC Arizona's authorized printing, bar-code tracking, and removal process. *See* ¶ 52, *infra*. As with other employees, PIPD carefully monitored Ms. Bernardo's printing and document removal activities, and knew exactly which documents Ms. Bernardo printed and took home in December 2024, but TSMC Arizona raised no concerns at that point, further evidencing the pretextual nature of Ms. Bernardo's interview. *Id*.

50.    A week passed after the interview, and during that time, TSMC did not raise any further concerns about Ms. Bernardo. On March 18, 2025, at 1:30 p.m. PT, the court and parties in the *Howington* class action participated in a Case Management Conference. Minute Entry, Dkt. 46, *Howington*, No. 5:24-cv-5684 (N.D. Cal. Mar. 18, 2025). Later that day, at 6:57 p.m. PT, TSMC Arizona emailed Ms. Bernardo informing her that her "employment with TSMC Arizona is being terminated, effectively immediately." The email stated that an "independent investigation conducted" by PIPD had determined that Ms. Bernardo (1) "violated the Company's P.I.P. policies" by "disclos[ing] highly confidential and sensitive information to a third-party outside of TSMC," and (2) for providing "evasive or stock answers" to questions posed during TSMC's investigatory interview, including answers to questions concerning Ms. Bernardo's communications with counsel. TSMC Arizona intentionally waited until after the Case Management Conference in the *Howington* case to terminate Ms. Bernardo, ensuring that her retaliatory termination could not be raised or discussed at the conference.

1

**TSMC's Pretextual Claims of Policy Violations by Ms. Bernardo**

2

3

*TSMC's Complaint Policy, Proprietary Information Protection Procedures, and Code of Conduct.*

4

51.    TSMC maintains a "Complaint Policy and Procedure for Certain Accounting

5

& Legal Matters."[6] The company has pledged to comply with this policy, which provides

6

multiple, open reporting channels for "internal and external voices" to raise complaints with

7

TSMC. In 2023, there were 348 incidents reported through TSMC's Audit and Risk

8

Committee Whistleblower System, Ombudsman System, and Irregular Business Conduct

9

Reporting System, 218 of which "were related to people management/employee relations,"

10

another 117 of which related to "private matters" or asking personal questions, and 13 of

11

which were "related to ethics." *Id.* at 59. In investigating incidents, TSMC assures those

12

participating in investigations that they will not face retaliation *Id.* ("TSMC also prohibits

13

any form of retaliation by providing proper protection for any individual who in good faith .

14

. . participates in an investigation."). Of the 348 incidents reported through the system in

15

2023, five were "verified" upon investigation and "determined for disciplinary action." *Id.*

16

Each quarter, TSMC employees are notified about what discipline of violations has

17

occurred to ensure that employees will not engage in similar misconduct. *Id.*

52.    To protect proprietary information, TSMC maintains a Proprietary

18

Information Protection ("PIP") Policy. This policy prevents the "unauthorized use or

19

unauthorized disclosure of Proprietary Information," a term which is defined by TSMC to

20

mean information "that is owned, controlled, or under the care or responsibility of TSMC."

21

TSMC's CEO designated an internal group at TSMC known as the Proprietary Information

22

Protection Division ("PIPD") to investigate "compliance and enforcement of the PIP

23

Policy." If a violation of the policy is found, establishment of disciplinary actions is

24

coordinated jointly between Human Resources ("HR") and PIPD. TSMC also maintains a

25

---

[6]    TSMC   Annual   Report   2023   at   58,   https://investor.tsmc.com/sites/ir/annual-report/2023/2023%20Annual%20Report_E.pdf .

corporate "Code of Ethics" that, among other things, instructs employees to "protect proprietary information of TSMC."[7]

53.    PIPD functions across TSMC, including in Arizona, and is charged with monitoring employee access to and handling of TSMC documents and information. TSMC documents are stored on servers, which PIPD monitors, including by tracking which documents employees open and review during the course of the day. PIPD also tracks the specific documents that employees print, including the number of copies that are printed, and flags suspicious printing activity.  TSMC has instituted procedures (overseen by PIPD) to ensure that TSMC documents are not taken from its facilities without authorization, one of which is to use special paper that is embedded with metal in its printers. TSMC manufactures the metal paper in Taiwan, and ships it to its facilities in the U.S., including in Arizona. Any employee leaving TSMC's premises in Arizona has to walk through metal detectors, and an employee carrying unauthorized TSMC documents will trigger the metal detector and will be required to surrender the documents. Documents authorized to be taken out of TSMC's facilities are affixed with a pre-approved bar code on each page and can pass through TSMC's metal detectors. PIPD staff monitor which documents are printed with bar codes and can be taken out of the facility.

*TSMC's Progressive Discipline Policy and Disciplinary Procedures.*

54.    TSMC has a Progressive Discipline Policy for TSMC and its subsidiaries, including TSMC's operations in Arizona. In her Human Resources capacity, Ms. Bernardo helped draft this policy. The policy is designed to foster corrective behavior of violations of TSMC's corporate policies. The Progressive Discipline Policy has been used in connection with investigations concerning a number of matters, including matters involving unprofessional behavior such as sexual harassment, inappropriate physical contact, and violation of the PIP Policy. Per the Progressive Discipline Policy, if an employee is deemed to have violated a TSMC policy, TSMC is required to go through a progression of steps to

---

[7]  TSMC Annual Report 2023 at 58, https://investor.tsmc.com/sites/ir/annual-report/2023/2023%20Annual%20Report_E.pdf .

foster corrective behavior. First, TSMC is required to provide the employee verbal coaching, identifying the actions that TSMC believes violate its policy and the specific policy violated. Second, if behavior is not corrected and continues, TSMC is required to provide an employee with a verbal warning, which puts the employee on notice that her employment could be at risk if she does not change her behavior. Third, if behavior is still not corrected, TSMC is required to provide a written corrective action plan, which identifies in writing how exactly the employee is violating a TSMC policy and TSMC must then allow any violation to be corrected. Finally, if the employee behavior is still not corrected, TSMC can terminate the employee.

*TSMC's Violation of its Own Policies and Procedures*

55.    In terminating Ms. Bernardo, TSMC Arizona gave her no verbal coaching, no verbal warning, and no written warning for the purported "violations" of its PIP Policy, as required by TSMC's Progressive Discipline Policy. TSMC Arizona also violated its Complaint Policy and Procedure, which prohibits "any form of retaliation" for anyone who participates in a TSMC investigation, by terminating Ms. Bernardo after she voluntarily sat for an interview. As per its quarterly reporting process, TSMC will now report to other employees the circumstances of Ms. Bernardo's termination from the company to help ensure that no one else engages in conduct similar to Ms. Bernardo, like filing a complaint that reveals information TSMC does not want revealed. The firing of Ms. Bernardo stands in stark contrast to TSMC's discipline of other employees where only five of the 348 "incidents" investigated in 2023 resulted in any form of discipline and it is highly unlikely that those disciplined were treated as harshly or promptly as Ms. Bernardo. *See* ¶ 50, *supra*.

*Treatment of Ms. Bernardo Relative to Other Employees*

56.    TSMC Arizona's actions against Ms. Bernardo stand in stark contrast to its, as well as TSMC's, treatment of its preferred category of employee—East Asians. For example, TSMC Arizona "investigated" and terminated Ms. Bernardo for purportedly sharing information with her counsel when preparing a discrimination complaint. In stark contrast, East Asians who engage in extreme acts of misconduct—including, by way of

example, a Taiwanese executive whose allegations of misconduct are so severe that they are not suitable for public disclosure—are not subjected to the same treatment that TSMC Arizona (and TSMC) reserves for non-East Asians, including Ms. Bernardo. That is, the retaliation against Ms. Bernardo compared to TSMC Arizona's failure to discipline East Asians who legitimately engaged in corporate misconduct is part of TSMC Arizona's (and TSMC's) discrimination and retaliation against non-East Asians, who TSMC Arizona (and TSMC) seek to punish for voicing legitimate complaints of discrimination and poor treatment. Any comparison between TSMC's treatment of Ms. Bernardo and its treatment of other people investigated for misconduct would reflect the severity of TSMC's retaliation. *See* ¶ 53, *supra*.

57. TSMC terminated Ms. Bernardo even after she disclosed that she was suffering adverse health consequences for which she relied on TSMC's insurance for coverage.

## COUNT I
## (Retaliation in Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)

58. Ms. Bernardo re-alleges each preceding paragraph as though fully set forth herein.

59. Ms. Bernardo engaged in a protected activity under Section 1981 by reporting to TSMC Arizona concerns about TSMC's discriminatory practices, including its hostile work environment, and by seeking to participate as a Named Plaintiff in a class action lawsuit challenging those same practices.

60. TSMC Arizona retaliated against Ms. Bernardo because she engaged in this protected activity, resulting in significant harm to Ms. Bernardo—she was demoted, stripped of her job responsibilities, given an unfairly low S- performance review rating, denied training, had her printing privileges revoked, was subjected to an increasingly hostile work environment, and was ultimately terminated following a sham investigation.

61. A causal link exists between the adverse actions taken against Ms. Bernardo and her engagement in the protected activity. Shortly after Ms. Bernardo complained to

TSMC Arizona regarding discrimination and its hostile work environment, TSMC stripped Ms. Bernardo of responsibilities, denied her training that she had requested, gave her an unjustifiably low performance review score, subjected Ms. Bernardo to an increasingly hostile work environment, and revoked her printing privileges. Similarly, just sixteen days after TSMC learned that Ms. Bernardo wished to participate in the *Howington* class action as a Named Plaintiff, TSMC opened a sham investigation of her, and terminated Ms. Bernardo the following month, just one week after Ms. Bernardo participated in the TSMC interview. The temporal proximity between Ms. Bernardo's engagement in protected activity and TSMC's retaliatory actions, coupled with Ms. Bernardo's harsh treatment as compared to other employees accused of policy violations, and TSMC's violations of its own policies in its mistreatment of Ms. Bernardo, establish that TSMC's retaliation was a direct result of Ms. Bernardo having engaged in protected activity.

62.    But for Ms. Bernardo's engagement in protected activity, the retaliatory, adverse actions TSMC took against Ms. Bernardo would not have occurred.

63.    TSMC's actions constitute unlawful retaliation in violation of 42 U.S.C. § 1981.

### COUNT II
### (Retaliation in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3)

64.    Ms. Bernardo re-alleges each preceding paragraph as though fully set forth herein.

65.    Ms. Bernardo engaged in a protected activity under Title VII by reporting to TSMC Arizona concerns about TSMC's discriminatory practices, including its hostile work environment, and by seeking to participate as a Named Plaintiff in a class action lawsuit challenging those same practices.

66.    TSMC Arizona retaliated against Ms. Bernardo because she engaged in this protected activity, resulting in significant harm to Ms. Bernardo—she was demoted, stripped of her job responsibilities, given an unfairly low S- performance review rating, denied training, had her printing privileges revoked, was subjected to an increasingly hostile work

environment, and was ultimately terminated following a sham investigation.

67.    A causal link exists between the adverse actions taken against Ms. Bernardo and her engagement in the protected activity. Shortly after Ms. Bernardo complained to TSMC Arizona regarding discrimination and its hostile work environment, TSMC stripped Ms. Bernardo of responsibilities, denied her training that she had requested, gave her an unjustifiably low performance review score, subjected Ms. Bernardo to an increasingly hostile work environment, and revoked her printing privileges. Similarly, just sixteen days after TSMC learned that Ms. Bernardo wished to participate in the *Howington* class action as a Named Plaintiff, TSMC opened a sham investigation of her, and terminated Ms. Bernardo the following month, just one week after Ms. Bernardo participated in the TSMC interview. The temporal proximity between Ms. Bernardo's engagement in protected activity and TSMC's retaliatory actions, coupled with Ms. Bernardo's harsh treatment as compared to other employees accused of policy violations, and TSMC's violations of its own policies in its mistreatment of Ms. Bernardo, establish that TSMC's retaliation was a direct result of Ms. Bernardo having engaged in protected activity.

68.    But for Ms. Bernardo's engagement in protected activity, the retaliatory, adverse actions TSMC took against Ms. Bernardo would not have occurred.

69.    The foregoing conduct constitutes unlawful retaliation in violation of 42 U.S.C. § 2000e-3.

## COUNT III
### (Retaliation in violation of the Arizona Civil Rights Act ("ACRA"), A.R.S. §§ 41-1463 to 41-1481)

70.    Ms. Bernardo re-alleges each preceding paragraph as though fully set forth herein.

71.    Ms. Bernardo engaged in a protected activity under ACRA by reporting to TSMC Arizona concerns about TSMC's discriminatory practices, including its hostile work environment, and by seeking to participate as a Named Plaintiff in a class action lawsuit challenging those same practices.

22

72.    TSMC Arizona retaliated against Ms. Bernardo because she engaged in this protected activity, resulting in significant harm to Ms. Bernardo—she was demoted, stripped of her job responsibilities, given an unfairly low S- performance review rating, denied training, had her printing privileges revoked, was subjected to an increasingly hostile work environment, and was ultimately terminated following a sham investigation.

73.    A causal link exists between the adverse actions taken against Ms. Bernardo and her engagement in the protected activity. Shortly after Ms. Bernardo complained to TSMC Arizona regarding discrimination and its hostile work environment, TSMC stripped Ms. Bernardo of responsibilities, denied her training that she had requested, gave her an unjustifiably low performance review score, subjected Ms. Bernardo to an increasingly hostile work environment, and revoked her printing privileges. Similarly, just sixteen days after TSMC learned that Ms. Bernardo wished to participate in the *Howington* class action as a Named Plaintiff, TSMC opened a sham investigation of her, and terminated Ms. Bernardo the following month, just one week after Ms. Bernardo participated in the TSMC interview. The temporal proximity between Ms. Bernardo's engagement in protected activity and TSMC's retaliatory actions, coupled with Ms. Bernardo's harsh treatment as compared to other employees accused of policy violations, and TSMC's violations of its own policies in its mistreatment of Ms. Bernardo, establish that TSMC's retaliation was a direct result of Ms. Bernardo having engaged in protected activity.

74.    But for Ms. Bernardo's engagement in protected activity, the retaliatory, adverse actions TSMC took against Ms. Bernardo would not have occurred.

75.    The foregoing conduct constitutes unlawful retaliation in violation of ACRA.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Bernardo prays for relief as follows:

a.    A declaratory judgment that the practices complained of herein are unlawful and violate Section 1981, Title VII, and ACRA;

b.    A permanent injunction against TSMC Arizona and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with it,

from engaging in unlawful policies, practices, customs, and usages set forth herein and injunctive relief including reinstatement of Ms. Bernardo to her position at TSMC;

     c.     Order TSMC Arizona to pay the wages, salary, employment benefits, and other compensation denied or lost to Ms. Bernardo to date by reason of TSMC Arizona's unlawful actions;

     d.     Order TSMC Arizona to pay Ms. Bernardo compensatory damages for the harm she suffered as a result of TSMC Arizona's violations of Section 1981, Title VII, and ACRA;

     e.     Order TSMC Arizona to pay the costs of this action, attorneys' fees for this action, an amount to compensate Ms. Bernardo for the time spent on this action, and an amount for the emotional turmoil Ms. Bernardo must endure to pursue this action;

     f.     Award Ms. Bernardo prejudgment interest at the prevailing rate on the compensatory damages as a result of TSMC Arizona's retaliating against her in violation of Section 1981, Title VII, and ACRA;

     g.     Award Ms. Bernardo exemplary and punitive damages;

     h.     Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

     i.     Award Ms. Bernardo other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury.

**DATED** this 10th day of September, 2025.

/s/ Daniel Kotchen
Daniel Kotchen (*pro hac vice motion forthcoming*)
KOTCHEN & LOW LLP
1918 New Hampshire Ave. NW
Washington, DC 20009
(202) 471-1995
(202) 280-1128 (Fax)
dkotchen@kotchen.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

/s/ Troy Foster
Troy Foster (State Bar No. 017229
The Foster Group PLLC
902 West McDowell Road
Phoenix, Arizona 85007
(602) 461-7990
Tfoster@thefosterlaw.com
*Attorneys for Plaintiff*